Case number 19-3085 United States of America versus Francis Bankins appellant. Mr. Zucker for the appellant, Mr. Carroll for the appellate. Good morning Mr. Zucker. We'll hear from you. Can't hear, can't hear you. Mr. Zucker, I believe you're muted. You're muted. Can you hear me now? Yes. Yes. Okay. Apologize. John Zucker on behalf of appellant requests five minutes for a rebuttal. I'm gonna ask before you do anything else in this case that each of you go back and review the videos, the evidence in the case, the exhibits in the case, because I think that's where everything begins and ends. There are, and I'm gonna ask you to watch them several times, and I'm gonna ask you to watch them with clear eyes, and by what I mean by clear eyes, watch them for what really occurred, for what the tapes accurately recorded occurred that day without being affected by any findings made. Because I think if you view them that way, you'll have the most accurate depiction of what did occur. Are you is not clearly erroneous? No, I'm suggesting it is. It absolutely is, and I don't, this is not a legal case in the sense that there's no dispute about the law here. It's pretty clearly, it's a Terry stop, and the question of law is reviewed de novo, and it's it's the questions of facts that are reviewed for determine whether they're clearly erroneous. And interestingly, I think both sides quote the Latham case, which says that it is only if there is objective evidence, documentary or objective evidence, that contradicts the factual findings made is there clear error. And I suggest to you, the most objective evidence in this case is what is recorded on the cameras, and that is what shows, with all due respect to the trial court, that the findings made were clearly erroneous. And I don't think you can find anything more objective than those tapes. Nobody's nobody's quarreling that they were doctored in any way, or that they were recorded anything that that they aren't accurate. And I think if you look at those tapes, what you'll see, and the most, there's only maybe 35-40 seconds of each ones that matter, but what you'll see is when Banken's car is stopped, Officer Vigil is standing towards the rear passenger door, and there's a conversation between Tysons and Vigil, I'm sorry, Tysons and Bankens. And during that conversation, some back and forth about getting out of the car. But as soon as Bankens gets out of the car, he had been trying to hand his identification to Tyson. And as soon as he gets out of the car, he drops it, he bends down and picks it up, and you have the exact angle that Officer Vigil saw from that point forward. And that angle is of Mr. Bankens' back. There is absolutely no view, once Bankens stands up, of the front of his jacket. And there's, the only, the claim justification for this here, is that Vigil says he saw a sagging of the front pocket, and a bulging of the front pocket, and the tapes establish that he could not have seen that which he claims to have seen at that point. Because what you'll see is he has a view of Bankens' left shoulder, and from the back. He simply could not have seen the front pocket. But doesn't the video, there's another exhibit, one of the exhibits that's in the record for us to review, is Vigil's, Vigil's body cam itself, correct? That's what I'm talking about. And what that shows is that he immediately goes for the pocket. He doesn't frisk, you know, him around the waist, or starting at the ankles, or shoulders, or anything else. He goes right for the pocket and basically says, you know, there it is. But that's why I'm going to ask you, I'm going to ask you. So isn't, isn't that pretty compelling evidence that he went straight for that because he saw something there, and so it doesn't really contradict the District Court's factual finding? If it were true, you'd be right. But I suggest to you that the tape contradicts that finding. The tape doesn't show him go straight for that pocket? Not at all. Not at all. What you will see, he's looking, Vigil is looking at Bankens' back the entire time until Bankens is told to step back. At that point, Vigil grabs Bankens' right arm with both, both of his hands. And that's when, as, the point being that he could not have seen any sagging prior to that. When he reaches, he grabs the right arm because the right arm is next to the right pocket, and a gun is in the right pocket. No, he grabs the right arm because that's what's closest to him, and he's helping him turn around. And as he does that simultaneously, and that's why I'm asking you to please go back and look at these tapes, and that one in particular, numerous times, because what you will see is Vigil's right hand go across Bankens' body, and you can't see it here. I'm trying to step back. I hate these things. Initially, he taps the left pocket, and then he takes his hand, and there's nothing in the left pocket. He takes his hand across the hem of the jacket. Seems to me he's probably trying to feel the waist, and then he gets the right pocket second. Now, he denies this for the exact reason that you said, and that's why I'm begging you to please look at those tapes carefully, because that is what occurred, and that is the biggest tell in this case, that what he did was acted on a hunch. He reaches for the left pocket, taps it, and then comes across the body, grabs the right pocket. That's when he feels the gun, spins the guy around, and gives the 1-800 call for a firearm. That's also corroborated to a lesser extent by Exhibits 2 and 3, which are different angles of the same thing, but you cannot see his hand as clearly as you can in Exhibit 1, and Judge Wilkins, you pointed right to the critical point in that case, and I, well, at the risk of being repetitive, that's the key to this case. Watch his hands. You'll see he hits the left pocket first, goes across the bottom hem of the garment, and then gets the right pocket, and you're right. Had he been suspicious of a sagging right pocket, and had he suspected a gun would have been there, he would have gone for that first, but that's not what he does, and that's not what the tapes show, and I've requested five for rebuttal. I'm already into that. If there's anything more, obviously, I'll respond. Judge Rauh, Judge Edwards? Oh, no questions. All right, we'll give you your time on rebuttal. Thank you. All right, Mr. Carroll, we'll hear from you. Thank you, Your Honors, and may it please the Court. My name is Ethan Carroll, and I represent the United States. The District Court did not clearly err in crediting the testimony of Officer Vigil, and it correctly concluded that the police had reasonable articulable suspicion to Frisco Pellant because, first and foremost, of the front right side of his coat, which was sagging noticeably lower than the left side of his coat throughout the course of the traffic stop. Second, Appellant displayed initial reluctance to exit the lawfully stopped car. It was approximately 28 seconds from the point in time when Officer Tyson first asked him to stop the car. Officer Tyson had to repeat his request that Appellant step out of the car seven different times before Appellant finally complied. And third, Officer Vigil only grabbed Appellant by the arm after that arm began moving downward toward the pocket where Officer Vigil reasonably thought that Appellant had a firearm. Taking one point from my friend's argument first, the District Court did make findings about the exact claim that Appellant is now seeking to revive on appeal, which was the of the frisk. On page 143 of the record is where the District Court actually resolved this issue that Appellant is now raising about the manner of the frisk, whether Officer Vigil went for directly for the pocket, as the District Court found, and as the government argued below, or whether, as Appellant argued in the District Court but did not raise in his brief, whether Officer Vigil instead went for the waistband in its entirety and only ended up at Appellant's right pocket. That isn't a point that Appellant raised in his brief. As a result, it's waived. It's not properly made for the first time during oral argument. So that would not be something that would be proper for this court to consider. Putting the impropriety of raising that during oral argument aside, as the District Court correctly found, and as this court can't find clear error for, it's just not what the body-worn camera shows. In any event, body-worn camera, like any other kind of footage, objective evidence would have to contradict the testimony of an officer for this court to find clear error. In the case that Appellant rightfully cites to, I believe it's Lathurn, this court has said that it is virtually impossible, or sorry, let me get the exact language, that the decision, a District Court's decision to credit testimony of a witness can virtually never be clear error in absence of the various objective indicia, like video footage, or internally contradictory testimony, or testimony that's simply incredible. As the District Court noted, as the parties agreed below, the body-worn camera just doesn't, well first it doesn't capture the exact angle that Officer Vigil was, that Officer Vigil's eyes were at. So the body-worn camera, which is in the center of the chest, as the parties agreed below, is just a different angle than Officer Vigil's eyes. Unlike Officer Vigil's eyes, the body-worn camera isn't able to move, it's unable to move with Officer Vigil's neck, it's unable to turn side to side, it is at a fixed angle in the center of his chest. So I guess I would disagree with counsel to the extent to which counsel argues that the body-worn camera captures the exact same view as Officer Vigil had, and I would also note that this court's clear error test requires not only that, it doesn't just look at video footage alone, it doesn't look as judgeable, because as you rightfully noted, this court's test is not de novo for reviewing credibility findings, and the government respectfully argues that the district court did not err in crediting the testimony of Officer Vigil. In particular, there's one point- Mr. Carroll, sorry, with respect to reasonable suspicion, I mean this case doesn't have some of the same factors of our other cases, finding reasonable suspicion, you know, the search was during daytime, it wasn't in a high crime area, you know, the suspect wasn't necessarily evasive, how do those factors fit into a finding of reasonable suspicion? Sure, so as your Honor is aware, reasonable suspicion is a lesser standard than even probable cause, and there isn't any, it's a totality of the circumstances test, and there every single case. Here, what the government's arguing is that the most, the factor that should be given the greatest weight is the evidence sag in Appellant's coat, and the reason that's of such significance, and it is, and to answer sort of the question that's implied, and even stated in Appellant's brief, is how do we know that it wasn't something else, how do we know that it wasn't his wallet in his hand, his cell phone in his hand, and then his lanyard coming out of the left-hand pocket, which I think it's a reasonable conclusion to understand that it's probably keys on the end of that lanyard. Despite all the things that you would normally look for in such circumstances, keys, wallet, cell phone, the right-hand side of Appellant's jacket is noticeably lower than the left-hand side throughout the course of the stop, and we're not just saying that it's the sag of the coat alone. We are saying that those other factors, which add weight to that key observation, are what push this over the edge and make it a case where there's reasonable articulable suspicion. So Judge Rao, as you know, there, it's not, there was no testimony that it was a high crime area. It was at 5 p.m. at night, but there are additional factors that add to the sag of the coat. Is it suspicious for someone to not want to get out of their vehicle if they're a passenger and they haven't done anything? Why is it suspicious for them to ask why they should have to get out of their vehicle? So this court in United States v. White, which is a 1981 decision, said that an initial refusal to exit a stopped car and furtive hand movements added up to reasonable articulable suspicion. I'm not saying that there isn't also a potential innocent explanation, but that's not what this court's review is. This court is whether, this court's review looks at whether a given objective circumstances were consistent with a suspicious reason. So there are multiple inferences that could be drawn, but the trial courts, and this case law makes clear that reluctance to exit a vehicle is properly viewed as suspicious. Again, I'm not saying that that alone is enough. What authority? You're just citing the White case, that's it? So there's White. There's also Johnson, sorry, United States v. Johnson, which was a Sixth Circuit case. What else do you seem to suggest that there's a wealth of authority in the D.C. Circuit for that point? I mean, the reluctance to get out of a vehicle seems to be neither here nor there. Most of us would be reluctant to get out of a vehicle. No one's sitting around waiting to be invited by the police to get out of the vehicles. Of course, you're reluctant. And White, you said there was a furtive gesture. That was the additional factor. Yes, Your Honor. And I'm not saying that reluctance alone is enough. I'm saying that the reluctance paired with subsequent appearance in the jacket, the sagging of the jacket, and then the additional factors. But wasn't reluctance suspicious because of the furtive gesture? So in other words, if there's no furtive gesture accompanying reluctance, then why should reluctance get any weight? Reluctance. Well, so I guess the reluctance is a reason for the officer to be thinking something here might be up. Right. And it's not just, I guess, the reluctance here is noticeable. I repeated the, I guess, noted the extent of it, the fact that Officer Tyson had to ask appellant to step out seven different times before appellant finally did. It gives the officer a reason to be on notice and a reason to be noticing things like the sag of the appellant's coat, to be noticing things like the fact that the coat is unseasonable and zipped up, to be noticing things like the fact that appellant is taking a step backwards, to be on guard for the fact that his right arm is dropping down toward the pocket that's already creating a together. It's the totality of them in a traffic stop where as this court has been cautious and solicitous of the fact that traffic stops are inherently dangerous for officers. The officer didn't draw any inferences as I recall in his testimony from the step back. So the officer's subjective, the officer's subjective beliefs really don't change this legal determination about whether circumstances are suspicious or aren't suspicious. I'm not, yeah, I read the argument in the brief. I'm still not sure I understand, nor do I understand what the First Circuit meant to say about that. If the officer doesn't notice something and doesn't draw any inferences from it, we can avoid that by saying, well, a reasonable officer would have. That's your argument? That's strange argument. No. So I guess I would disagree with the premise slightly of what your Honor has stated. In Wright, there wasn't any, Wright is the First Circuit case that your Honor is mentioning. In Wright, there wasn't any testimony at all about the, particularly about the sort of testified about the stiff step back as being one of the things that gave him pause. So they're just different in terms of the evidence that was in the record. And I view Wright as just a case about there not being evidence in the record that gave foundation to the District Court's conclusion. If there are no further questions, I'd ask that this Court. Thank you. Anything further, Judge Edwards, Judge Rowe? No. All right. Thank you, Mr. Carroll. Thank you. All right. Mr. Zucker, you had just over three and a half, about three and a half minutes left. I think Judge Edwards hit the nail on the head when the officer never testified that the reluctance to leave the car, that the jacket played a factor, that the step back played a factor. None of those factored into the officer's evaluation that there was a basis to have reasonable suspicion. The officer gave two distinct facts. One was the sagging of the pocket. And the second one, no, I'm trying to remember. Oh, it was the movement of the arm. And I think if you, that's why I asked you again to look at the tape, because I think the tape contradicts both of those points. But, Mr. Zucker, doesn't Pennsylvania v. Mims cause a problem for you? Because in that case, didn't the Supreme Court okay a frisk where the only thing that was cited was a bulge in a jacket? If factually, yes, that would be. But our position is the tape contradicts whether or not the officer could have seen that based on the angles. So the only way you win is if we find that to be clearly erroneous? Yes. That factual. I agree. That would be, you would have to find that clearly erroneous. And I suggest based on the angle of the camera, which is, as counsel pointed out, it's about 12 inches beneath the officer's eyes. It records the exact angle that Brock Vigil would have been looking at and seeing the defendant. And from that perspective, you cannot see the front of the jacket. You cannot see a bulge. Now, counsel, you're stressing in your argument a point that the opposition says you didn't raise on appeal. And as I understand it, that's correct. You said that's the whole thing. And the whole thing was not raised before us. It was raised in the trial court. Trial court ruled against you. You did not re-raise it. You have to do that. Well, I beg to differ in the sense that it was raised because our whole point was he could not have seen the bulge. No, no, no. Your argument, as I heard you, your argument was, and I listened carefully, exhibit one. And what you'll see is the officer reaching across to the right side and as if I'm trying there, and then I'm coming across till I get to the left side. That was raised in the district court. You did not raise that. I believe it was raised by implication by saying he could not have seen what he claimed to have seen. In retrospect, I probably should have included that argument as well into the brief, but I don't think it undermines it because what you're looking at is the tape recording of what the officer claims. And so if the tape contradicts his claim that he went to the pocket first, then the exhibit itself contradicts his statement. And that's what I'm suggesting, is it's clear error because the tape contradicts the statement of the officer and the deference accorded the officer's recounting of the event should not have been given because he could not have seen that which he claims to have seen based on, and the tapes established that. The other one is the reaching is, in retrospect, obviously that should have been included, but I don't think it's a new issue raised for the first time on an argument. I don't think that's a new issue. Thank you, Mr. Zucker. Thank you, Mr. Carroll. We will take the matter under advisement. Call the next case, please.
judges: Wilkins, Rao, Edwards